MARIE MORRISON, As GUARDIAN AD LITEM OF BARBARA ANN MORRISON, AN IN-FANT, AND ARCHIE MORRISON v. CONCORD KIWANIS CLUB, PHIL W. WILSON, AND MELANIE WESTBROOK

No. 8019SC895

(Filed 16 June 1981)

1. **Master and Servant § 33— respondeat superior—negligence of employee required**

When an injured party seeks damages from an unincorporated association on the theory of respondeat superior, the unincorporated association cannot be held liable in tort for negligence without a jury finding of negligence on the part of an employee of the unincorporated association while acting as such and within the scope of his employment; therefore, the jury verdict that defendant club's employees were not negligent negated any liability of defendant club to plaintiffs on the theory of respondeat superior.

2. **Negligence § 30.2— camp for handicapped children—defendant's negligence not proximate cause of injury**

In an action by the minor plaintiff to recover for injuries sustained while she was at a camp for handicapped children operated by defendant club, the trial court properly entered judgment n.o.v. for defendant where the evidence did not show that any negligence on the part of defendant was a proximate cause of plaintiff's slipping from the seat of a swing onto its floorboard and

any resulting injuries, and there was no evidence that the accident would not have occurred if defendant club had followed the customary standards for operating camps for handicapped children in N.C. in 1976.

APPEAL by plaintiffs from *Seay, Judge.* Judgment entered 14 March 1980 in Superior Court, CABARRUS County. Heard in the Court of Appeals 2 April 1981.

This is a civil action wherein plaintiffs seek to recover of defendants damages for injuries suffered by Barbara Ann Morrison while at a camp run by defendant Concord Kiwanis Club. In a complaint filed 19 April 1978 and amended 20 June 1978, plaintiff Marie Morrison, the mother of and the duly appointed guardian ad litem for Barbara Ann Morrison, and plaintiff Archie Morrison, the father of Barbara Ann Morrison, alleged the following: Barbara Ann Morrison, who has "physical disabilities resulting from the fact that she has had cerebral palsy since birth," was invited to attend the annual health camp for disabled children to be held by defendant Concord Kiwanis Club (hereinafter "Kiwanis Club") from 1 August to 7 August 1976 at Camp Spencer, located in Cabarrus County; defendants Phil W. Wilson and Melanie Westbrook were acting as agents and employees of defendant Kiwanis Club at the camp; Barbara Ann Morrison was brought to the camp by her mother on 5 August 1976; while in the care of defendants, who knew of Barbara's disabilities, including her "lack of balance control," Barbara was placed by one of the individual defendants "unsupported" on a "swing glider which was then placed in motion," whereupon Barbara fell from the "swing glider," incurring serious injury; and Barbara's injury was proximately caused by the negligence of defendants in failing to exercise due care for Barbara's safety, in failing to properly supervise their agents and employees, and in failing to "use properly qualified individuals to look after the kinds of disabled children, like Barbara Ann Morrison, who attended the health camp." Plaintiff Marie Morrison, guardian ad litem, sought damages for pain and suffering while plaintiff Archie Morrison sought damages for medical expenses he incurred in the treatment and care of Barbara following the accident.

Defendants filed answer 19 June 1978, admitting that the health camp was conducted by defendant Kiwanis Club at Camp Spencer on the dates indicated, that Barbara was brought to the

camp on 5 August 1976, and that defendants Wilson and West-brook knew that Barbara "suffered from some disabilities," but denying the other material allegations of the complaint. Defendants Wilson and Westbrook further averred that the accident was unavoidable and all answering defendants alleged contributory negligence on the part of plaintiffs for failing to "properly advise the defendants sufficiently as to Barbara Ann Morrison's condition. . . ."

In an order on final pre-trial conference filed 3 March 1980, defendants stipulated *inter alia* as to certain medical expenses and also that defendants Wilson and Westbrook were acting as agents and employees of defendant Kiwanis Club.

Plaintiffs offered evidence at trial tending to show the following:

Barbara Ann Morrison, age nine, has had cerebral palsy since birth, and she had generally been confined to a wheelchair prior to the incident in question, although she was "walking some with a walker . . . with someone holding on to her and helping her." Barbara had been diagnosed in 1969 as "nonambulatory, a moderate to severely involved cerebral palsy spastic quadriplegic" with lack of normal motor control in all four limbs, and she had undergone treatment, including hospitalization in 1973 and 1974, under the care of a physical therapist. With the aid of surgery, Barbara was able to make significant progress in learning to walk with a walker, but because of her problems with movement and balance, Barbara was never able to transfer herself in and out of her wheelchair. When she would attempt to climb into the chair and start to slip and fall, she would go into a "startled reaction" which would prevent her from catching herself. Nevertheless, her attitude in 1974 was described as "enthusiastic," and up to the time of the incident in question, she retained a positive attitude about walking.

The Morrisons had another daughter, Deborah, who was classified as a "borderline retarded child." The Morrisons' first contact with defendant Kiwanis Club's camp at Camp Spencer was a letter inviting Deborah for a week session especially for non-handicapped children. The Morrisons accepted and Mrs. Morrison met defendants Wilson and Westbrook when she took Deborah to the Concord Boys Club, where a bus was to take

Deborah to the camp. Mrs. Morrison gave them a letter from the Division for Disorders in Development and Learning at the University of North Carolina at Chapel Hill which evaluated both Deborah and Barbara. Thereafter, Barbara was invited to defendant Kiwanis Club's camp for handicapped children to be held the week beginning 1 August 1976. This camp was free, as defendant Kiwanis Club paid for all expenses.

Mrs. Morrison did not bring Barbara to the camp until 5 August 1976 because Barbara had a cold. After being greeted by defendant Westbrook, the Morrisons met some of the other children at the camp and then Mrs. Morrison explained Barbara's problems with balance control to defendant Westbrook. Mrs. Morrison detailed certain problems they had had with Barbara in the bathtub, and told defendant Westbrook not to let Barbara "go up and down the ramp by herself." Defendant Westbrook did not ask for Barbara's camp registration form which had already been partially filled out by Mrs. Morrison, and the form was not discussed. Also, a medical evaluation of Barbara was not requested by defendant Kiwanis Club or anyone at the camp.

Later on the evening of 5 August 1976, after the Morrisons had returned home, plaintiff Archie Morrison was informed by his brother that Barbara had been taken to the hospital following an accident at the camp. The accident occurred when Barbara fell off of a "swing glider" at the camp. This "swing glider" was similar to one the Morrisons had at home. As a result of the injuries suffered in the accident, Barbara was in the hospital in traction for "approximately four or five weeks" and thereafter underwent extensive therapy.

Plaintiffs also offered the testimony of Mr. Bill Kissam, tendered to and accepted by the court as an expert in "the customary usage and practice of camps in North Carolina in 1976 dealing with disabled children" as to the customary standards for the operation of such camps in several areas including the following: registration and intake procedures at such camps; obtaining medical information on prospective campers; procedures upon arrival at the camp; procedures when a camper arrives without a camp application or medical history; camp organization and training for staff, especially with respect to recognition of physical limitations of individual campers; and accident procedures.

Kissam also testified, in answer to a hypothetical question, that the procedures used by defendant Kiwanis Club did not meet the customary standards. Kissam further testified that the fact that a person has gained experience in working at a camp for the handicapped does not necessarily mean that such a person is properly trained to work with handicapped children.

At the close of plaintiff's evidence, defendants moved for a directed verdict in favor of defendants but the court reserved its ruling on the motion. Defendants then offered evidence tending to show the following:

Defendant Kiwanis Club, a civic organization located in Concord, North Carolina, has conducted a free annual one-week camp for handicapped children at Camp Spencer for approximately 25-30 years. Activities at the camp included typical summer camp activities, such as swimming, boating, playing ball, and arts and crafts, as well as special activities like field trips. Without considering the time put in by members of the Kiwanis Club, the approximate cost of conducting one of the annual camps is $2,000, which is raised through various projects of the organization. The Camp Spencer facilities were provided free of charge by the Concord Boys Club, which maintained the facilities. In 1976, defendant Kiwanis Club had no established procedures for operating the camp. No medical information from a camper's doctor was required, nor were any doctors or nurses on hand at the camp, since the camp was not designed to deliver medical services to the children. Rather, the purpose of the camp was to provide for children who could not afford to go elsewhere "the opportunity to experience things they had never experienced." Defendant Kiwanis Club also did not provide any formal training for the camp staff in how to deal with disabled campers, since the club felt that the staff at the camp had the necessary experience.

The camp staff in 1976 consisted of defendant Wilson, who was the Director, defendant Westbrook, and several others. Defendants Wilson and Westbrook were in charge of planning all the camp's activities. Defendants Wilson and Westbrook were both qualified lifeguards and water safety instructors. Defendant Wilson, a junior high school teacher, became Director of the camp in 1974. In 1976, he had worked at fourteen of the annual one-week camps, and had seen a wide range of physical handicaps:

"hydroencephalitis to muscular dystrophy, cerebral palsy, multiple sclerosis, polio, children who were blind and deaf." He was also qualified as an Emergency Medical Technician. Defendant Westbrook, a kindergarten teacher, had been a counselor at the camp for eight of the annual one-week sessions. Defendant Westbrook is the sister of defendant Wilson.

Members of the camp staff were observed nearly every day by members of defendant Kiwanis Club who stated that the staff did "an excellent job in giving these children the tender, loving care that they need at this camp." The staff and the campers did everything together as a "close-knit group" and a "good rapport" existed between campers and counselors. None of the staff, however, had ever received any formal professional training in dealing with disabled children.

Defendant Westbrook first met Mrs. Morrison when Deborah was brought for the camp for the non-handicapped. Barbara, in her wheelchair, had accompanied her mother, and in the course of the conversation between Westbrook and Mrs. Morrison, Westbrook told Mrs. Morrison that she thought Barbara would enjoy the "week of handicap camp." Neither Mrs. Morrison nor her husband made any further inquiries as to the nature of this camp or the qualifications of its staff personnel. Thereafter, Barbara was sent an invitation to attend this camp for the week beginning 1 August 1976. The letter inviting Barbara contained a narrative explaining that the purpose of the camp was to provide activities for enjoyment and the letter was accompanied by a registration form. Neither the narrative nor the questions on the registration form indicated that the camp would provide any curative or therapeutic services for the child; instead, the information sought was "how do you treat your child in the home," such that the camp could imitate that situation.

Defendant Westbrook called Mrs. Morrison on 4 August 1976, after the camp had begun, inquiring as to whether Barbara would be coming to the camp. Mrs. Morrison explained that Barbara had had a cold, but was feeling better, and when Westbrook said that Barbara could still come for the remainder of the week, and that Deborah could come as well, Mrs. Morrison said they would come in the morning. The next morning, Westbrook greeted Mrs. Morrison when Mrs. Morrison, Barbara, and Deborah arrived at the

camp. Westbrook did not ask Mrs. Morrison for the registration form, but instead asked her "the major concerns" of the form, since she felt she "could understand more" with a verbal conversation. No written statement from Barbara's doctor was obtained, and when Westbrook inquired of Mrs. Morrison as to any special needs or problems for Barbara, Mrs. Morrison mentioned only that Barbara had difficulties when going to the bathroom in that "you have to either hold her up while she pulls her pants up, or while she props up, you pull her pants up." Nothing was said in reference to a balance problem. Westbrook told Mrs. Morrison that the campers "don't just sit around" but play ball, go canoeing, and go swimming. Mrs. Morrison said Barbara would enjoy all these things and said something to Barbara about riding in a boat, and Barbara said she would. Westbrook asked if that was all, and Mrs. Morrison said "yes." Mrs. Morrison then left.

That morning, during some activities in the dining hall, Westbrook escorted Barbara to the bathroom, where Barbara had no difficulty in sitting on the commode. After lunch and a rest period, the campers, including Barbara, went canoeing. Barbara sat on the floor of the canoe. While the others then went swimming, Barbara sat on the pier, talking with defendants Wilson and Westbrook. Barbara was facing a swing set located nearby and she asked if she could go swing. Wilson and Westbrook "tried to put her off," but Barbara kept begging to swing. Wilson and Westbrook continued to refuse, since they did not want to leave the rest of the campers, but Barbara kept wanting to go to the swing. Wilson asked Barbara if she had been on a swing before, and Barbara said she had. To corroborate this, Wilson then asked Deborah if Barbara had been on a swing before, and Deborah said Barbara had. Wilson then carried Barbara over to the swing, a "little stagecoach-like glider," and placed Barbara in it. Westbrook accompanied them and went to the opposite side of the swing from Wilson.

The swing was "real low to the ground." Barbara sat with her hands to the side, holding on to the seat of the swing. Wilson asked if it would not be better to hold the little bars at the side, but Barbara seemed to think it would be more comfortable to hold the seat, so Wilson let her. Barbara did not appear to have any trouble with her balance. Satisfied that Barbara was secure and comfortable, Wilson pulled the swing back "a few inches" and

let it go. Westbrook was standing, "close enough to get hit," beside the glider seat on the side opposite to Wilson. The swing "went up once and back slightly" and at that point Barbara "slid from the little seat area onto the floorboard, the little sections on the bottom of the glider." Neither Wilson or Westbrook had time to catch Barbara. One of Barbara's legs touched the sand underneath, and her foot caught one of the slats in the glider, but her legs were not twisted in any way.

Barbara began crying, complaining that her leg was hurting. Wilson and Westbrook began trying to contact Mrs. Morrison, but they could not locate her. Wilson was later able to contact an aunt and he told her he would take Barbara to the hospital. Barbara was then taken to the emergency room.

Defendants also offered testimony that the glider swing was in good condition both before and after the accident. In addition, several other persons testified to the effect that Wilson, Westbrook and the other staff members handled the disabled children at the camp in a careful manner and that the care given was adequate in all respects.

At the close of all the evidence, defendants renewed their motion for a directed verdict, but the court again reserved its ruling on the motion. Plaintiff moved to amend the pleadings to conform with the evidence, which was allowed.

The following issues were submitted to an answered by the jury as indicated:

1. Was the minor plaintiff Barbara Ann Morrison injured or damaged by the negligence of Phil W. Wilson?     *No*

2. Was the minor plaintiff Barbara Ann Morrison injured or damaged by the negligence of the defendant Melanie Westbrook?     *No*

3. Was the minor plaintiff Barbara Ann Morrison injured or damaged by the negligence of the defendant Concord Kiwanis Club?     *Yes*

4. What amount, if any, is the minor plaintiff Barbara Ann Morrison entitled to recover for personal injuries?     *$10,000.*

5. What amount, if any, is Archie Morrison entitled to recover for personal injuries received by Barbara Ann Morrison?     *$10,000.*

Defendants then moved for judgment notwithstanding the verdict with respect to defendant Kiwanis Club. From a judgment notwithstanding the verdict in favor of the defendant Kiwanis Club, plaintiffs appealed.

*Helms, Mullis & Johnston, by W. Donald Carroll, Jr., for the plaintiff appellants.*

*Homesley, Jones, Gaines & Fields, by Edmund L. Gaines and Aimee A. Toth, for the defendant appellees.*

HEDRICK, Judge.

Plaintiffs first contend that the court erred in allowing defendants' motion for judgment notwithstanding the verdict as to defendant Kiwanis Club. Plaintiffs argue there was substantial evidence presented to support the jury's verdict that defendant Kiwanis Club negligently operated its 1976 camp for handicapped children. We disagree.

A motion for judgment notwithstanding the verdict presents the question of whether the evidence was sufficient to entitle the plaintiff to have a jury pass on it. *Hunt v. Montgomery Ward and Co., Inc.,* 49 N.C. App. 642, 272 S.E. 2d 357 (1980). The evidence must be considered in the light most favorable to the party opposing the motion, and the opponent is entitled to the benefit of every reasonable inference which may legitimately be drawn from the evidence, and all conflicts in the evidence are resolved in favor of the opponent. *Potts v. Burnette,* 301 N.C. 663, 273 S.E. 2d 285 (1981).

[1]  An unincorporated association like defendant Kiwanis Club can certainly be held liable in tort for its own active negligence if such negligence is the proximate cause of the injury giving rise to damages. If, however, the injured party is proceeding upon the theory of *respondeat superior,* the unincorporated association could not be held liable in tort for negligence without a jury finding of negligence on the part of an employee of the unincorporated association while acting as such and within the scope of his employment. *Johnson v. Lamb,* 273 N.C. 701, 161 S.E. 2d 131

(1968); *Hudson v. Gulf Oil Co.*, 215 N.C. 422, 2 S.E. 2d 26 (1939). *See also*, 78 A.L.R. 365, 53 Am. Jur. 2d Master and Servant § 406; 57 C.J.S. Master and Servant § 616.

The jury's verdict that defendant Kiwanis Club's employees, Wilson and Westbrook, were not negligent negates any liability of defendant Kiwanis Club to plaintiffs on the theory of *respondeat superior*. Thus, the only question remaining is whether the trial court erred in concluding that the evidence was insufficient to support a verdict against defendant Kiwanis Club on the theory that defendant Kiwanis Club's own negligence was a proximate cause of the accident and injury to Barbara Ann Morrison.

[2] Plaintiffs argue that defendant Kiwanis Club was actively negligent in that it failed to comply with the customary standards for operating a camp for handicapped children in North Carolina in 1976, especially in the areas of staff training with respect to recognizing physical limitations of individual campers, obtaining medical information on prospective campers, and registration and intake procedures. Assuming arguendo that the evidence does disclose that defendant Kiwanis Club was negligent in one or more of these areas, we conclude that the evidence does not show that any such negligence on the part of defendant Kiwanis Club was a proximate cause of Barbara's slipping from the seat of the swing onto the floorboard, and any resulting injuries. There is no evidence in this record that the accident would not have occurred if defendant Kiwanis Club had followed the customary standards for operating camps for handicapped children in North Carolina in 1976 as presented by plaintiff's evidence. Therefore, the trial court did not err in entering judgment notwithstanding the verdict for defendant Kiwanis Club.

Plaintiffs also have brought forward several assignments of error based upon exceptions to rulings by the trial court with respect to the admission and exclusion of evidence. We have carefully considered all the excluded evidence and find that such evidence does not tend to show that the conduct of defendant Kiwanis Club was a proximate cause of the accident and resulting injury. Such evidence, therefore, could not have affected the result, and these assignments of error are meritless.

The judgment appealed from is

Affirmed.

Judges ARNOLD and WEBB concur.